ROBINSON (SHARPLESS v.). See Case No. 12,713.

## Case No. 11,968.

### ROBINSON v. TUTTLE et al.

[2 Hask. 76.] [1]

District Court, D. Maine. Sept., 1876.

BANKRUPTCY — ILLEGAL PREFERENCE — INSOLVENCY — CREDITOR'S KNOWLEDGE — LIEN PAID — ATTACHMENT — TRUSTEE PROCESS.

1. A creditor, taking security upon all his debtor's property knowing it to be insufficient to pay his own debt and the other creditors in full, is held to know "that the transaction is in fraud of the bankrupt act" within the meaning of the amendment of 1874 [18 Stat. 178].

2. A creditor, receiving a conveyance of his debtor's property to secure his own debt, and a sum paid by him to raise a valid attachment thereon made more than four months prior to bankruptcy proceedings of the debtor, may, in equity, retain a lien thereon for the sum so paid, although the conveyance is a fraudulent preference and void under the bankrupt act, qua his own debt.

3. Attachment by trustee process within four months of the debtor's proceedings in bankruptcy is absolutely void; and the assignee may disregard the same, and recover the property from the supposed trustee, regardless of any judgment entered in the suit after the debtor has been adjudged bankrupt.

4. The validity of an attachment on a writ in Maine cannot be determined in that suit.

5. The discharge of a trustee in an action at law at nisi prius, to which discharge exceptions are pending in the law court, cannot be pleaded as a judgment in bar of another action.

In equity. Bill by [Daniel C. Robinson] the assignee in bankruptcy of Benoice Loomis [against Chandler Tuttle and Josiah Tilton], to set aside a conveyance as a fraudulent preference under the bankrupt act. Involuntary proceedings were begun February 22, 1875. The answer denied the debtor's insolvency at the date of the conveyance, December 26, 1874, and the creditor's knowledge that a fraud upon the bankrupt act was intended, and averred that the conveyance secured both the creditor's own debt and a sum paid to discharge a valid attachment made more than four months prior to the debtor's bankruptcy proceedings, and that at the suit of another creditor he had been adjudged trustee by a state court. Proofs were taken.

Joseph Baker, for orator.

D. D. Stewart and Nathan Webb, for respondents.

FOX, District Judge. The bill charges the fraudulent conveyance by the bankrupt, when insolvent, to Tuttle, of cattle, horses, sheep and hay, all of the alleged value of $1,389, with a view to a preference of Tuttle as a creditor, and also to hinder, delay and defraud his creditors in violation of the provisions of the bankrupt law. Some of the articles are charged to have been sold by Tuttle, and the balance to be held by the other defendant, Tilton a deputy sheriff, under attachment as the property of Loomis,

---

[1] [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

made within four months of bankruptcy proceedings against him. Tuttle's answer is full and specific, denying in repeated instances all knowledge or cause to believe that Loomis was insolvent December 26th, or that the conveyance was made to give him a fraudulent preference, or in fraud of any of the provisions of the bankrupt act. It sets forth that in November, 1870, Loomis, who was then a farmer, improving a large and valuable farm worth more than $3,500, and in good credit, borrowed of him $450 at nine per cent. interest; that from time to time other sums were borrowed, amounting in all in December, 1874, to over $800; that on the 25th of December, Loomis informed him he had been sued by Henry Hudson for $650 and that his stock on his farm had been attached, and that he was desirous Tuttle should pay Hudson his debt and stop the cost and take a bill of sale of the stock and hay to secure him his prior claims as well as the Hudson debt, and that an absolute bill of sale of the personal property was given to him by Loomis, as it was the arrangement that Tuttle should dispose of the property as occasion might offer, and after paying these claims, he was to account to Loomis for any balance remaining in his hands, and that he could, by securing the absolute title, make sale of the property without requiring any release of Loomis' title, as would have been necessary if he had received a mortgage security. The answer further sets forth that Tuttle has disposed of portions of the personal property for the sum of $1,152, a considerable amount remaining undisposed of, which is now claimed by Tilton under his attachment.

From the admissions of the parties as well as from the evidence in the case, it is quite certain that prior to the first of December, 1874, the credit and pecuniary standing of Loomis, in the neighborhood where he dwelt, were generally considered good, and that he was not considered as insolvent, when the fact was, he was then deeply insolvent. His farm was then under a mortgage to his sister for about $1,200, made in 1869, and to a brother for $1,600, given in 1873, and these incumbrances exceeded the value of the estate in December, 1874. The only other real estate of the bankrupt was fifteen acres of wild land, estimated by him as worth but $50. All the personal property then belonging to the bankrupt was the stock on his farm, worth about $1,200 or $1,500, and which had been attached by Hudson in his suit August 27, 1874.

It is unnecessary for me to recite in detail the testimony of the various witnesses, or to decide whether or not some of them have confounded the dates at which they may have had the conversations with Tuttle recapitulated in their testimony. Sufficient is it for the court on the present occasion to state certain facts which are not substantially controverted by Tuttle, and which as it appears to the court must control its decision.

The supreme judicial court of Maine, for the county of Somerset, sat on the third Tuesday of December, 1874. The action of Hudson v. Loomis on his note, which had been due more than a year when suit was instituted on it, was then pending and was defaulted the first day of the term, December 15th, when Tuttle was present and knew of the default. Up to that time I do not think that Tuttle had any question as to the solvency of Loomis, but these proceedings in court excited his suspicion and put him upon inquiry, and he examined the records and found that Loomis' real estate was incumbered for its full value. He doubted the honesty of their incumbrance, but on inquiry of Loomis, was informed they were bona fide, and justly due to the mortgagees, and that nothing remained for him in that quarter. He ascertained that from the stock and other property on the farm if properly managed, he could in all probability realize sufficient to pay Hudson's debt and the amount due to himself from Loomis; but there would be nothing left for the other creditors, amounting to $2,800.

It was therefore agreed between him and Loomis, that Tuttle should pay up the Hudson demand and take a bill of sale of all the personal property on the farm and turn it into money as soon as practicable, and after paying these claims should account to Loomis for anything remaining in his hands.

Before the matters were concluded or the money paid for the Hudson debt, Tuttle was informed of a debt of $100 that Loomis owed, and of Loomis' note to the bank for $100 then overdue which he was requested to pay or secure; but he declined so to do for the alleged reason that there was not enough to secure his own claims.

To set aside a conveyance as a fraudulent preference, the purchaser must be shown to have had reasonable cause at the time to believe his vendor insolvent and to have known that such conveyance was in fraud of the provisions of the bankrupt act.

Had Tuttle at that time, December 26th, reasonable cause to believe Loomis was insolvent? I have no doubt that he then well knew that Loomis was insolvent, for he had ascertained that his real estate was mortgaged for its full value, that his note to Hudson had been due more than a year when it was sued, that all the property which Loomis had of any value was his farming stock that was held by Hudson's attachment, and that the whole of it would not be more than sufficient to pay the Hudson demand and Loomis' indebtment to him. He knew of $200 more that Loomis was owing, and, when asked to secure a portion of it from this personal property, refused so to do for want of sufficient amount; and if anything more was requisite, inquiry among the traders at Skowhegan would have soon satisfied him of the large amount then due from Loomis to various parties in that place. I am

well satisfied therefore that Tuttle must, from the facts then well known to him, have believed Loomis at that day utterly insolvent, and that after he had procured this bill of sale knew that not a dollar's worth of personal property remained to Loomis liable to attachment.

One is to be held chargeable with knowledge of the necessary inevitable result of his actions; and applying this principle to Tuttle's conduct, I cannot but find that he knew that this conveyance to him was a preference denounced by the bankrupt law, and in fraud of its provisions. He well knew that Loomis was indebted to other parties, and that by this arrangement Loomis was giving him a preference to the entire exclusion of every other creditor, and that all of his remaining property would be taken for the payment of Tuttle's claims, leaving nothing for any one else. Loomis must have thus intended to secure Tuttle, leaving his other creditors unsecured; and Tuttle was fully advised of Loomis' purpose and object, and of its effect upon other creditors.

By this scheme, a fraud upon the law was devised and effected, as the equitable distribution of his property among all his creditors, which is one of the great purposes contemplated by the bankrupt law, was utterly frustrated thereby; and the knowledge of the fraudulent object, now made requisite by the amendment of 1874, is demonstrated to have been well known to Tuttle when he received this conveyance. So far therefore as this bill of sale of December 26th, of the personal property, was intended as a security for the prior indebtment of Loomis to Tuttle, it is most clearly invalid, and can not be sustained as against the assignee in bankruptcy.

It is claimed that if such should be the opinion of the court, that it may still be sustained as a valid security for the amount advanced by Tuttle to Hudson, and that the court will enforce it to that extent. Hudson's debt was secured by a valid attachment on Loomis' property which has continued for four months, lacking but a single day, at the time Tuttle purchased this demand. The action of Hudson v. Loomis had been defaulted and an execution could have been had at any moment and placed in the hands of the officers, which would have established a complete and perfect lien on the property, from the moment of its seizure.

Bankruptcy proceedings were not instituted until February 22d, and nothing, therefore, had taken place to impair Hudson's security which a single day would have perfected beyond controversy. It is therefore claimed that Hudson, having this valid security, has, by the payment made to him by Tuttle, relinquished and vacated this lien on the bankrupt property, and that in equity, upon the principles of subrogation, Tuttle should be allowed the amount thus paid by him for the benefit of the estate.

In my opinion, as against the assignee, Tuttle has the greater equity, and should be allowed the sum so paid. Hudson could have diminished the estate to the extent of his debt if he had taken the property and applied it in satisfaction of his judgment against Loomis. Tuttle has paid this claim and asks to be repaid only what he has saved the estate by his so doing, and it is inequitable for the assignee to attempt to deprive him of recompense for the benefit he has thus conferred on the estate. The case would have been altogether different if Hudson's debt had not been secured to him. If his debt had been Loomis' note without security of any kind which Tuttle had paid, all that Tuttle could have insisted upon would have been to be invested with the same rights which Hudson before possessed, which were only those of an ordinary unsecured creditor; and if Loomis had afterwards seen fit within the sixty days to have given him security for the amount thus paid to Hudson on his account, such security could not be sustained, on the ground of a present consideration having passed from Tuttle by reason of this payment, be being aware of the real condition of Loomis' affairs as they are shown to have existed at the time.

These views are sustained in this district in Bucknam v. Goss [Case No. 2,097], and by the opinion of Mr. Justice Bradley in Lathrop v. Drake, 91 U. S. 516, in which it was decided that if a creditor advances money to pay a valid execution, and then takes a judgment for the same and his own debt, an execution thereon will be good as to the advance, but not as to the cost.

The last case disposed of the technical objection enforced in Denny v. Dana, 2 Cush. 160, that there can be no apportionment for security, and that a mortgage of personal property, which, as to some portion of the debt is in violation of the insolvent laws, is wholly void; an objection which in my view should never have been sustained in favor of an assignee in bankruptcy.

As a further ground of defense, the respondent in his answer avers that on the 12th of February, 1875, and prior to the commencement of this bill, J. P. Blunt & Co., creditors of Loomis, instituted a process of foreign attachment against Loomis, and Tuttle as his trustee, returnable to the supreme judicial court of Maine, Somerset county, March 5, 1875; that said suit was duly entered and Tuttle appeared and made disclosure therein, the plaintiff in said action claiming to hold Tuttle chargeable as trustee for the alleged cause that the bill of sale of December 26, 1874, was taken by Tuttle with the design and intent to delay and defraud the creditors of Loomis; that after due proceedings said Tuttle was discharged as said alleged trustee, and he therefore sets up and relies on this judgment in the trustee process as a bar to these proceedings in equity in

the behalf of the assignee. Various answers may be given to this defense:

1. The suit in the state court was entirely res inter alios. Blunt & Co. were creditors of Loomis and were among the petitioners who instituted these proceedings against him; but in their proofs of foreign attachment they represented no other parties than themselves. An adjudication in that suit could not be used as evidence in a suit commenced by any other of Loomis' creditors, and the assignee could not interfere, and take any part in the conduct of the suit in the state court, excepting to plead the bankruptcy of the original debt; with the trustee's disclosure, he could not interfere in any way or be represented therein; and it is quite certain therefore, that upon general principles of law, the discharge of the trustee, at the suit of an individual creditor, could in no way affect the claims of the assignee representing the creditors generally.

2. The record of the suit of Blunt & Co. v. Loomis & Tr., which consists in docket entries, proves that there has been no final adjudication of the question whether the trustee is or not chargeable. At the nisi prius term, the order of the presiding justice was that the trustee should be discharged; but exceptions were taken to this order, and the questions are now pending before the law court, so that there has not been such a judgment and final disposition of the trustee suit as the answer relies upon. The exceptions suspended the judgment of the court, and no judgment has been rendered in the suit which could be pleaded in bar of another suit; the evidence, therefore, does not sustain this branch of the answer, but on the contrary, proves that such judgment as therein claimed was never rendered in the trustee suit.

It is claimed in argument that the record of this proof from the state court, although the cause is still undetermined, presents a valid defense in the present action; that the process of foreign attachment having been instituted before this bill in equity, it was the duty of the assignee to have appeared in the suit in the state court, and pleaded therein the decree of bankruptcy; and not having so done, the present bill can not be sustained.

The docket entries show that in the state court, the bankruptcy of Loomis was entered on the docket in that suit, but the cause for some reason was allowed to remain in court. Whether the court, acting upon the information thus brought to its knowledge of the bankruptcy, for that cause discharged the trustee does not appear; it certainly would have been justified in doing so, as the attachment was a nullity, having been instituted but a few days before commencement of proceedings in bankruptcy.

The argument of the learned counsel for Tuttle was, that the only method in which his attachment could be defeated was by the assignor's opposition and plea of bankruptcy; but such I do not understand the law to be. I have no doubt that he could adopt that course if he wished so to do, but as the attachment was made within four months of the bankruptcy proceedings, it became a nullity which could in no way derive any strength or validity from the courts in which the cause was pending, nor from judgment in the suit.

There are many cases in which under such circumstances a state court would be required to give judgment, although there were attachments made within four months; for instance, in the classes of debts, fiduciary or any others from which by a discharge in bankruptcy the party is not relieved from his liability. In these cases, the plaintiff would be entitled to recover a judgment for his demand; but if he had secured the same by an attachment within the four months, it is clear, that although his judgment would be valid, he could not enforce any rights under his attachment. The property would fall to the assignee wholly released therefrom.

Rev. St. § 5044, declares that by operation of law, the assignment shall vest in the assignee the title to the bankrupt property, although the same is then attached on mesne process as the property of the debtor, and shall dissolve any such attachment made within four months next preceding the commencement of the bankruptcy proceedings.

Such an attachment being thus dissolved, the attaching creditor has lost all right under it from the execution of the assignment; and certainly, nothing can be found in the bankrupt act which revives or restores such an attachment by means and force of a judgment subsequently obtained in the action.

The practice in this, and probably in every district court of the United States has been, when a party proceeds in his suit and obtains judgment and execution and attempts to enforce the same upon property attached on the suit within the four months, to restrain him by injunction and an order to surrender the property to the assignee. I have granted more than a score of them, and I can find nothing in any of the decisions in the circuit or supreme court inconsistent with my so doing.

In Doe v. Childress, 21 Wall. [88 U. S.] 642, the proceedings in bankruptcy were not commenced until ten months after the attachment, and of course the same was not dissolved, but continued in force as security for the judgment.

If the assignee chooses, he can now intervene in the Blunt action, and plead the adjudication of bankruptcy; but under the law of this state, the question of the validity of the attachment, whether it is or not now on file, or has by operation of law, or neglect of the officer, been dissolved, cannot be determined in that suit. The party takes judgment, if his suit is undefended, at his peril; and if he afterwards makes claim to the property, the party retaining it is by the de-

cision of the courts of this state, always at liberty to prove that the attachment was in some way terminated.

The plaintiff, therefore, is entitled to a decree against Tuttle for the property undisposed of by him, and conveyed by bill of sale of Loomis of December 26, 1874, and also for any balance of money realized by him from sale of this property after paying to him the amount he has paid to Henry Hudson.

The deputy sheriff Tilton acquired no rights by his attachments, and must be enjoined from further interference with, or claim upon the property so attached. Decree accordingly.