EDWIN MOREY, and others,

*vs.*

CHARLES R. MILLIKEN, and others.

Androscoggin.   Opinion May 31, 1894.

*Insolvency. Preference. Proof of Debt. Law and Fact.*
*R. S., c. 70, § § 29, 52.*

By the Insolvent Law of Maine, R. S., c. 70, § 29, "A person who has accepted any preference, knowing that the debtor was insolvent or in contemplation of insolvency, shall not prove the debt on which the preference was given,

nor receive any dividend thereon until he surrenders to the assignee all the property, money, benefit or advantage received by him under such preference."

The court adheres to its former decisions defining the word " insolvent" or " insolvency" as applied under the statute to persons engaged in mercantile or commercial business, viz: an inability to meet maturing demands in the ordinary course of business.

This use of these words is adopted in all bankrupt and insolvent laws, when so applied, although they have a general and popular meaning, viz: an insufficiency of the entire property or assets of an individual to pay his debts.

Sections 29, and 52, of the Insolvent Law, relating to preferences, should be construed to have the same meaning, and be held to inhibit the proof a debt by a preferred creditor until the preference, invalid under the statute, shall have been surrendered.

The word, " knowing," in § 29, and the words, " having reasonable cause to believe," in § 52 as defined by the court, are almost, if not quite, identical in meaning.

*Held;* that a preference may be surrendered at any time, before the debt is finally disallowed, and the debt may be proved.

*Held;* in this case, that the creditors, against whose proof of debt objections have been filed, received security on their debt with express notice of their debtor's insolvency by a letter which brought the security to their hands; that having elected to hold the security coupled with such notice, they should be charged with taking it under those conditions.

When one inference only can be drawn from existing facts, it is a matter of law; *Held;* that a finding that the creditors did not know of their debtor's insolvency would be an erroneous decision of the legal inference to be drawn from existing facts of this case, and is error in law. EMERY, J., dissenting.

An exchange of securities of equal value works no prejudice to the creditors of an insolvent debtor and, therefore, should not be held void as a preference. But there must be an exchange. The replacing of securities already lost, by others to take their place, is not an exchange.

A preference cannot be upheld upon the ground that it was given in pursuance of a prior agreement to secure, even if such agreement be proven.

Where it was claimed that a preference had been purged by an agreement made between the deposing creditor and the assignees, with the approval of the insolvent court, *held;* that their action could not conclude other creditors from contesting the proof of debt, and showing an illegal preference.

See *Milliken* v. *Morey*, 85 Maine, 340.

ON EXCEPTIONS.

This was a case arising upon objections to the proof of debt of Morey & Company, filed in the estate of Denison Paper Manufacturing Company, Insolvent. The petitions to have the proof of debt re-examined were filed by Charles R. Milliken, George C. Wing and others. They alleged that Morey &

Company had received an unlawful preference from the insolvent debtor.

When Morey & Company filed their proof of debt with security, the following agreement was made between them and the assignees :

"This Instrument Witnesseth : Morey & Company claim that on March 2nd, 1887, the Denison Paper Manufacturing Company was indebted to them in the sum of one hundred and eighty-nine thousand three hundred and thirteen 45-100 (189,-313.45) dollars, and have proved their claim for that amount. On March 2nd, 1887, said Morey & Company held (as appears by schedule prepared by them), as collateral security for a part of said claim certain notes, open accounts and merchandise which had been transferred or assigned to them by said company. And a large part of said notes, accounts and merchandise is still held by said Morey & Company, and has not yet been realized upon and cannot be for a long time.

"Now, whereas, it being deemed desirable by the assignees and creditors of said company that the estate be wound up as soon as possible, said Morey & Company and the assignees of said company have examined into the value of such collateral now held by said Morey & Company, and the amounts already realized by them since March 2nd, 1887, and have agreed that the fair value of such collateral, including the amounts already realized, is fifty-three thousand eight hundred and sixty 85-100 (53,860.85) dollars, and have also found that a rebate should be made from the amount proved by said Morey & Company, of six hundred and thirty-seven 53-100 (637.53) dollars for interest.

"Now, therefore, it is agreed by and between the assignees of the Denison Manufacturing Company and said Morey & Company that said assignees release to said Morey & Company, and they do hereby release to said Morey & Company, all their right and interest as assignees in the notes, accounts and merchandise so held by said Morey & Company as collateral, and said Morey & Company agree that the amount of their proof and claim against the estate of said Denison Paper Manu-

facturing Company in insolvency shall be reduced, and it is hereby reduced, to one hundred and thirty-four thousand eight hundred and fifteen 07-100 (134,815.07) dollars, and that said Morey & Company shall receive a dividend or dividends on that amount ($134,815.07) and on no more.

"This agreement shall not take effect until it shall have been approved by his Honor, the Judge of the Court of Insolvency for the County of Androscoggin.

"In witness whereof, the said Morey & Company and Clarence Hale, E. Adson Gammon and Stephen G. Train, as they are assignees of the estate of the Denison Paper Manufacturing Company, have hereunto set their hands and seals this twenty-fourth day of June, 1887.

Morey & Co.   (Seal.)

Clarence Hale,   (Seal.)

E. A. Gammon,   (Seal.)

S. G.,Train,   (Seal.)

Per C. Hale.

The foregoing settlement, appraisal and agreements is hereby approved.

ALBERT R. SAVAGE, Judge."

The claim of Morey & Company was wholly disallowed in the court of insolvency, but sustained on appeal in this court below. The particulars of the preference are set out in the petitions as follows :—

"And your petitioners, on the best of their knowledge, information and belief, further represent and allege that said Morey & Company were not entitled to prove their debts aforesaid, or any of them, against said estate in insolvency, nor entitled to receive the dividend aforesaid, or any other dividend thereon ; because said Morey & Company on the first day of February, 1887, and at various times between said first day of February, and said second day of March, accepted preferences from said Denison Paper Manufacturing Company on said debts, knowing at the time when each such preference was accepted, that said Denison Paper Manufacturing Company was insolvent and in contemplation of insolvency, and yet said

Morey & Company have never surrendered to the assignees any part of the property, money, benefit, or advantage received by them under any of such preferences, but have ever since retained and still retain all the same.

"And for particulars thereof, your petitioners, on the best of their knowledge, information, and belief, set out and allege the facts following, to wit:—

"On said first day of February, said Denison Paper Manufacturing Company, was in fact insolvent and had not sufficient assets to pay the liabilities, or any considerable percentage thereof; and on said first day of February, said insolvent corporation concluded to cease operations and distribute its assets through insolvency or on some arrangement with its creditors, and became convinced that it was insolvent as aforesaid; and on the same day said corporation addressed to said Edwin Morey, and to said Morey & Company, two letters, each bearing date that day, copies of which are hereto attached and made a part hereof as though recited herein at length, and among other things, by said letters said corporation informed said Edwin Morey and said Morey & Company, that it, the said corporation, had concluded to cease operations and let its creditors determine the course to be pursued in the future, so that by said letters said Edwin Morey and said Morey & Company, were fully advised that said corporation was in fact insolvent and had concluded to wind up its affairs in the manner aforesaid.

"And said corporation in the letter aforesaid to said Edwin Morey and said Morey & Company, enclosed a bill of sale of all paper on hand, of the value of about eleven thousand six hundred forty-five dollars and eighty-one cents, ($11,645.81,) an invoice of other paper made for the Hartford 'Post,' of the value of about thirteen hundred seventy-one dollars and fifteen cents, ($1371.15,) and also, as stated in said letter, assignments of all the accounts in its power to assign, to wit:—Assignments of accounts of the nominal value of twenty-five thousand three hundred forty-eight dollars and forty-three cents, ($25,348.43,) as particularly shown by said copy of said letter of February one, eighteen hundred eighty-seven, to said Morey & Company, and by list of accounts assigned attached hereto.

"And further, thereafterwards, said corporation did in fact deliver, between said first day of February, and said second day of March, in accordance with the terms of said letters and for the purpose aforesaid, paper invoiced as aforesaid, and other paper amounting in all to two hundred forty-two thousand, two hundred thirty-five (242,235) pounds, and of the value of about twelve thousand ($12,000) dollars, as particularly shown by the schedule thereof attached hereto. And thereafterwards, between said first day of February, and said second day of March, in further pursuance of the terms of said letters and for the purposes aforesaid, said Denison Paper Manufacturing Company did further deliver, assign, and transfer to said Morey & Company one note of Lee & Shepard, of three hundred sixty-five dollars and forty-nine cents, ($365.49,) one note of D. Lothrop & Company, ($1000) one thousand dollars, cash remitted by Conrow Bros., one hundred thirty-eight dollars and five cents, ($138.05,) cash remitted by F. Wood, one hundred and forty-seven dollars ($147), note of Borland & Company, of seven hundred twenty-eight dollars and eighty-two cents ($728.82), and sundry lots of ash and bleach of the value of about thirteen hundred and fifty ($1350) dollars; so that all the assets assigned, conveyed, transferred, and delivered as an unlawful preference as aforesaid by said Denison Paper Manufacturing Company to said Morey & Company, were of the value of about forty thousand ($40,000) dollars; and yet said Morey & Company then, that is, on said first day of February, 1887, and at sundry times between said first day of February, and said second day of March, accepted all the same as a preference, knowing at the various times when they accepted the same, that all the same were unlawful preferences as aforesaid, and that said Denison Paper Manufacturing Company was then insolvent and in contemplation of insolvency; and said Morey & Company has ever since retained all the same and the proceeds thereof, and has never surrendered any thereof to the assignees of said insolvent estate."

Other facts are stated in the opinion.

*Symonds, Snow and Cook,* for Morey & Company.

Counsel argued that Morey & Company did not have actual knowledge of their debtors' insolvency. *Grant* v. *Bank,* 97 U. S. 80, S. C. 17 N. B. R. 498.

That the question whether, upon all the testimony in the case Morey & Company had knowledge when they received the security alleged as preferential that the Denison Company was insolvent, or in contemplation of insolvency, was properly a question of fact and the finding of the presiding justice that Morey & Company did not have such knowledge is final and conclusive. *Randall* v. *Kehlor,* 60 Maine, 37 ; *Mosher* v. *Jewett,* 63 Maine, 87 ; *Merrill* v. *Merrill,* 65 Maine, 81 ; *Kneeland* v. *Webb,* 68 Maine, 540 : *Clement* v. *Foster,* 69 Maine, 319 ; *Bailey* v. *Church,* 71 Maine, 474 ; *Manning* v. *Devereux,* 81 Maine, 562 ; *Pettengill* v. *Shoenbar,* 84 Maine, 105. The statute (chap 70, § 12), provides for exceptions only as to matters of law and not as to the findings of facts by the judge hearing the case of *nisi prius.*

That the findings of fact by the presiding justice relating to the execution of the instrument of settlement and release between the assignees of the Denison Company and Morey & Company, and his ruling as to its construction and effect, were correct and final and effective to conclusively determine the case irrespective of his finding of want of knowledge by Morey & Company of the insolvency of the Denison Company, or of any of his other findings, or rulings in the case. *Taylor* v. *Taylor,* 74 Maine, 558.

The assignees of a fraudulent debtor have power to confirm a sale of property made by him although it was made with the intent of giving a preference and the sale so confirmed cannot afterwards be avoided by them. *International Trust Co.* v. *Boardman,* 149 Mass. 162 ; *Richards* v. *Merriam,* 11 Cush. 582 : *Snow* v. *Lang,* 2 Allen, 18 ; *Butler* v. *Hildreth,* 5 Met. 50 ; *Freeland* v. *Freeland,* 102 Mass. 477. Assignees must exercise diligence in disaffirming preferences. *Hazelton* v. *Allen,* 3 Allen, 118.

*Seth M. Carter and John A. Morrill,* for Milliken, and others, objecting creditors.

Counsel cited: R. S. c. 70, § 52; *Nisbet* v. *Quinn*, 7 Fed. Rep. 760; *State* v. *Patterson*, 68 Maine, 473; *In re Hauck*, 17 N. B. R. 158; *Rison* v. *Knapp*, 4 N. B. R. 349, 359; *Martin* v. *Toof*, *Id.* 488, 492, S. C. 13 Wall. 40; *Dube* v. *Lewiston*, 83 Maine, 211; *Tibbetts* v. *Trafton*, 80 Maine, 264. *Butler* v. *Hildreth*, and last cases cited by opposing counsel relate to controversies over rights to property alleged to have been received as a preference, not to the provability of a debt.

SITTING: PETERS, C. J., WALTON, EMERY, HASKELL, WHITEHOUSE, WISWELL, STROUT, JJ.

HASKELL, J. Morey & Company proved their debt in insolvency against their insolvent debtor's estate to the amount of $134,815.07. To this proof objections were filed by other creditors that Morey & Company had received a preference in fraud of the insolvent law.

By an agreement in writing between Morey & Company and the assignees, approved by the judge of insolvency, it was stipulated that a fair value of the amount of security received should be considered $53,860.85, and that the same, together with rebates of interest amounting to $637.53, in all $54,498.38, should be deducted from the whole claim, and that the balance, $134,815.07, might be proved upon which a dividend should be paid.

In the insolvent court the objections were sustained and the proof disallowed. An appeal was taken to the court below where the case was heard and decided, and the decree of the insolvent court reversed, and the proof allowed. The case comes up on exceptions.

The insolvent law, R. S., c. 70, § 29 provides: "A person who has accepted any preference, knowing that the debtor was insolvent or in contemplation of insolvency, shall not prove the debt on which the preference was given, nor receive any dividend thereon, until he surrenders to the assignee all property, money, benefit or advantage received by him under such preference."

Under this statute, knowledge by the creditor of the debtor's insolvency or contemplated insolvency is made a condition precedent to the rejection of his claim upon which he may have received security. The fact of knowledge is made vital and must appear in order to reject a claim. It must be determined, too, like any other question of fact, from the evidence in the case. It may be inferred from a variety of other facts that are proved, after giving to each its proper legal significance. For instance, security taken out of the usual course of business has a strong legal significance, and, unexplained by other facts and circumstances, might be considered sufficient in law to show knowledge, but when explained by other facts, as by proof of solvency, *Dutcher* v. *Wright*, 94 U. S. 557, or facts that completely destroy its meaning in the mind of the recipient, it could not have that effect. The various facts shown in the case must each be considered, giving to each one its proper significance, and then, after properly weighing each element, the resultant fact becomes apparent.

The court below heard this case and filed a decision finding various facts upon which the decision rests. The controlling fact so found relates to the fact of knowledge of the debtor's insolvency or contemplated insolvency, by the creditors, at the time they received security claimed to be a preference. It is as follows :

"I find . . that said Morey & Company, when they accepted said securities [those claimed to work a preference], did not know that said Denison Paper Manufacturing Company [the insolvent] was insolvent or in contemplation of insolvency."

This finding of fact is a resultant fact to be inferred from other facts and circumstances, and must be held conclusive unless shown to be erroneous in law.

Morey & Company's debt was $189,313.47. As security they held certain notes, assets and merchandise. On January 20, they wrote their debtors, as near as can be gathered from the evidence,— the letter was not produced,— calling their attention to the dishonor of certain of their notes, and reminding them that, "unless they attended to the business more

promptly when they became due we would wind up the whole business , . . would stop." Receiving no reply, Morey & Company telegraphed Mr. Denison to come to Boston and received answer that he was unable to go but would write. He did write on the first of February, inclosing the assignment of various accounts and of the merchandise on hand, manufactured paper, and saying, among other things : "The assigned accounts is several thousand dollars short, and it has occurred by shrinkage in the price of paper, and paper rejected and returned, and discounts on lots retained, etc. We turn over all we can to cover the same." This is the preference complained of.

The letter also stated : "Your dispatch was received and in confirmation of reply to same I wrote you to say that we have concluded, after a careful consideration of your letter of January 20, to cease operations and let the creditors of the Denison Paper Manufacturing Company say what course, if any, we shall pursue in the future. I am aware that it will be a very uncomfortable position to place you in, as well as many others, but I cannot stand up under the load I have been carrying any longer and am unable to go to Boston for the present. I enclose you a bill of sale of paper on hand and have covered all of the assigned accounts that lies in my power. . . . We wish we could prevent this calamity but we see no relief amid present combination. We have as yet done nothing to precipitate this matter, and shall be at home during the balance of the week, but the amount we have to pay Friday will settle the matter, if no provision is made to protect same."

These extracts were written on Tuesday. One of the firm of Morey & Company went immediately to Mechanic Falls, the debtor's place of business, examined into its affairs, exercised the right of stoppage *in transitu* and giving no further assistance, the debtor's paper went to protest Friday.

At the trial the defendants claimed that these letters were notice to plaintiffs of their debtor's insolvency, and, in law, worked knowledge of the same. It is plain enough that the letters conveyed information of the debtor's insolvency, and alone, without evidence to control their meaning and import,

would sustain the defendant's contention and make the finding of the court below erroneous in law.

In this connection it is well to consider the meaning of the statute phrase, "knowing that the debtor was insolvent or in contemplation of insolvency."

I. Of the meaning of the word insolvent or insolvency. It is not always used in the same sense. "It is sometimes used to denote the insufficiency of the entire property or assets of an individual to pay his debts. This is its general and popular meaning. But it is also used in a more restricted sense, to express the inability of a party to pay his debts as they become due in the ordinary course of business." *Toof* v. *Martin*, 13 Wall. 47. The latter is the commercial use. It indicates an inability to continue business in the ordinary way; an inability to meet business obligations as they mature; an inability to keep one's credit good so that his commercial promises bear upon their face an assurance that they will be met as they mature.

It is also the use adopted in all bankrupt and insolvent laws, when applied to persons in commercial pursuits, where provision is intended for the liquidation of business interests, when they can no longer continue in the ordinary course, securing to the existing creditors an equal division of the assets before they shall be wasted and frittered away in a hopeless struggle, under conditions that compel disaster in the end.

In the statute phrase under consideration, the word insolvent or insolvency, when applied to the insolvent, a manufacturing corporation engaged in a mercantile business, has the same meaning and significance as in § 48 of the same chapter relating to fraudulent preferences, where its meaning has already been considered and defined in the case of an insolvent business corporation, viz : an inability to meet maturing demands in the ordinary course of business. *Clay* v. *Towle*, 78 Maine, 89. The same meaning as in the late bankrupt law, viz : inability to pay his debts in the ordinary course of business as men in trade usually do, and such must be the conclusion even though his inability be not so great as to compel him to stop business. *Wager* v. *Hall*, 16 Wall. 599 ; *Buchanan* v. *Smith*, 16 Wall.

308 ; *Dutcher* v. *Wright*, 94 U. S. 557. And the same as in the Massachusetts insolvent law, *Vennard* v. *McConnell*, 11 Allen, 562 ; *Barnard* v. *Crosby*, 6 Allen, 331 ; *Lee* v. *Kilborn*, 3 Gray, 594 ; *Holbrook* v. *Jackson*, 7 Cush. 136 ; *Thompson* v. *Thompson*, 4 Cush. 127.

II. Of the meaning of the word knowing or knowledge. It should be noticed that the word knowing is used in the section 29, now under consideration, instead of the phrase, "having reasonable cause to believe," used in § 52, relating to fraudulent preferences, and in the late bankrupt law and in most of the other State insolvent laws. "Having reasonable cause to believe," is defined by our court in the language of the Supreme Court in *Grant* v. *Nat. Bank*, 97 U. S. 80, to mean : "It is not enough that a creditor has some cause to suspect the insolvency of his debtor ; but he must have such knowledge of facts as to induce a reasonable belief of his debtor's insolvency in order to invalidate a security taken for his debt. . . . A man may have many grounds of suspicion that his debtor is in failing circumstances, and yet have no cause for a well-grounded belief of the fact. He may be willing to trust him further ; he may feel anxious about his claim and have a strong desire to secure it, and yet such belief as the act requires may be wanting." *King* v. *Storer*, 75 Maine, 63. That definition is, "knowledge of such facts as to induce a reasonable belief" of the resultant fact, insolvency ; hardly short of knowing it.

In *Knapp* v. *Bailey*, 79 Maine, 195, the question was whether a grantee had actual notice of an unrecorded deed. Actual notice means knowledge. And the court says : "The decided preponderance of authority supports the position that the statutory 'actual notice' is a conclusion of fact capable of being established by all grades of legitimate evidence." Knowledge must be proved in the same way or in many cases not at all.

The court further says in the same case : "If a party has knowledge of such facts as would lead a fair and prudent man, using ordinary caution, to make further inquiries, and he avoids the inquiry, he is chargeable with notice of the facts which by ordinary diligence he would have ascertained. He

has no right to shut his eyes against the light before him. He does a wrong not to heed the signs and signals seen by him. It may be well to conclude that he is avoiding notice of that which he really believes or knows. Actual notice of facts which, to the mind of a prudent man, indicate notice is proof of notice. . . . 'I cannot dare to know that which I know.'"

"Having reasonable cause to believe." The criterion made in section 52 for determining the validity of a preference as defined by our court is almost, if not quite, identical in meaning with the word "knowing" made by section 29 a criterion for receiving or rejecting a creditor's proof of a debt upon which he may have received a preference. And there are many reasons why they should be considered identical in meaning. The taking of a preference does not forfeit the right to prove the debt, as under some bankrupt laws. It only inhibits the proof until the preference shall be surrendered. When surrendered, the debt becomes provable. *Est tempus penitentiæ.* Until the preference be surrendered, the debt cannot be proved. We see no reason why a preference may not be surrendered at any time, before the debt be finally disallowed, and the debt be proved.

It seems reasonable that the legislature should have intended only to prohibit the proof of a debt until an invalid preference shall be surrendered. Why make a debt provable for the balance over a preference, and then make the preference recoverable by the assignee leaving the creditor with dividends on the balance of his debt only? Why make it possible for him to lose dividends on the amount supposed to have been paid by the preference after he shall have lost it? The statute prohibits his proof only, until he shall have surrendered the preference.

Both sections should be construed to have the same meaning, and be held to inhibit the proof of a debt, until a preference, invalid under the statute, shall have been surrendered. Such construction would practically be as favorable to the creditor as the other and would diminish litigation, as one trial would be likely to settle the right to the security and of proving the debt.

What then are the facts of this case as bearing upon the legal import of the letters claimed to work knowledge to plaintiffs of

the debtor's insolvency? The plaintiffs were merchants in Boston. The insolvent, a manufacturing corporation in Maine. The Denisons were its managers. In 1882, they, being in financial trouble, applied to the senior plaintiff for "advice and counsel." He aided them in arranging a settlement with their creditors, and also afterwards arranged that his firm should furnish them funds by indorsing their paper at two per cent taking security on their accounts. They had previously been selling their paper through a commission house paying a commission of five per cent with a guaranty of two and one half. Morey says : " They wanted to know if I would not make the advances at a less rate and they would sell the paper. I asked them how they would secure me in that way, and they said they couldn't secure me except in the assignment of the accounts, but I would have to trust to their integrity, but under no circumstances, aiding them as I had done, would they take advantage of the position I had occupied. A. T. Denison came to my office with tears rolling down his cheeks, said that it had saved them, and that I never should lose a dollar under any circumstances. I knew I took a risk, but I could not conceive it possible, when I was pulling a man out of the water to save him from drowning, he would put his hand around and take it out of my pocket."

Advances were continued until shortly before the failure when they aggregated about $189,000. Trial balances were forwarded to plaintiffs until July 1, 1886. That one is not produced. The one prior to it, January 1, 1886, is produced. It shows :

| | | |
|---|---:|---:|
| Real estate and new machinery as resources, | | $427,025.53 |
| Accounts and material, | | 142,053.67 |
| Total, | | $569,079.20 |
| Debts outstanding, | $411,792.64 | |
| Surplus, | 157,286.56 | $569,079.20 |

From this statement it appears that the debts exceeded the quick assets (accounts and material) $269,778.97. The next trial balance produced, which Walter Morey testifies was not more unfavorable than the last one received, taken from the books in June, 1887, shows liabilities in excess of quick assets amount-

ing to $512,323.33. On January 20, 1887, plaintiffs wrote the letter before referred to calling for more prompt attention to the payment of their notes and in answer came the letter of February 1, before recited, inclosing the preference complained of. This preference included all their accounts and merchandise on hand. A transaction that gave expression to their straightened condition. With it was express notice of their inability of themselves to meet their paper maturing three days afterwards. The plaintiffs then held all the available quick assets of their debtors and knew that their liabilities to other creditors amounted to above $200,000. Their own claim was nearly that sum. To be sure, the debtors held valuable real estate, but that could not be considered available to pay commercial paper about to fall due. The plaintiffs must have known that, without their help, the debtor's business would cease, as they were informed it would in the letter to them, inclosing the preference complained of. All the facts in the case tend to confirm the statements in the letter of February 1, unless it be the testimony of plaintiffs themselves, who say that they did not know that their debtors were insolvent. Of course, all members of the firm, some of whom did not take an active part in the management of the firm's business, would not necessarily have the same plenary knowledge that others would be expected to have. Nor is it necessary that they should, in order to charge the firm with knowledge. As one member of a partnership is agent for the others in the firm business, so the knowledge of one partner is knowledge of the partnership.

The senior plaintiff, Edwin Morey, testified relating to the information contained in the letter of February 1: "I took the letter and telegram and put them together and I thought Adna was sick at home and blue and thought I was not going on with the help and that he had sent that dispatch, written that letter— I didn't consider at that time but what he would come through with it all right. I had supposed that they had a large surplus, not valuing the materials at any price it would be likely to bring. I saw this trial balance they would send to me from time to time, and when they were first sent to me they put their

balances there to what it stood on the books, but I objected and insisted that the plant should be cut down to $250,000. My impression was that if the property brought in accordance with their trial balances *they could pay in full*, it is only an impression ; when I got that telegram I thought that he didn't know how to move and that he was sick and blue at home."

This indicates that the solvency of which this witness speaks was an ability, on liquidation, to pay in full. And he adds : "It is only an impression." The witness does not distinguish between commercial insolvency, the inability to continue business in the usual course, and actual insolvency on final liquidation. He says : " I thought Adna was sick at home and blue, and thought I was not going on with the help [advances] and that he had sent that dispatch, written that letter.—" In the letter he was told, " We have concluded, after a careful consideration of your letter of January 20 [calling for more prompt payment of commercial paper], to cease operations and let the creditors of the Denison Paper Manufacturing Company say what course, if any, we shall pursue in the future. . . . The amount we have to pay Friday will settle the matter, if no provision is made to protect the same." Edwin Morey received that letter on Tuesday. A member of his firm immediately went to the debtor's place of business, examined its condition, and did not help to prevent the paper maturing on Friday from dishonor, but submitted to the condition of affairs of which he was told by the letter to be inevitable. He knew the debtors were commercially insolvent, unable to continue in business for a single hour without the aid of his firm ; that, after further investigation, he withheld. This letter, too, contained assignments to him of all the debtor's quick assets, a transaction out of the usual course of business, and, to a commercial man, strong proof of the tale of woe that the letter apprised him of. The information in the letter and the preference that it brought to plaintiff's hands were contemporaneous. The one plainly said I am insolvent, and the other invested him with all the available security within the debtor's power. There is no evidence in the case that controls this transaction or tends to control it, or explains its legal meaning. It

is not contended that the debtor was not actually insolvent. The creditor knew its business and its commercial credit, had complained of its inattention to maturing paper, was informed of its inability to further continue business and that the creditors must decide what course to pursue. These facts gave a reasonable cause to believe that the debtor was insolvent, carried conviction that it must be so, and under this statute worked knowledge of the fact. There is no evidence in the case tending to show that the statements in the letter were untrue, and time has thoroughly verified their truth.

It is too well settled to contend that findings of fact by a presiding justice can be reviewed in any case where an appeal is not given. The doctrine in such cases is well stated in *Coolidge* v. *Smith*, 129 Mass. 556. "The judge who presided at the trial in the court below was in a position in which he was required to exercise the functions of both judge and jury. His conclusions as to the weight and sufficiency of the evidence, and the credit which he ought to give to the witnesses, are binding upon us and are not open to revision. *Forsythe* v. *Hooper*, 11 Allen, 419. If there was any evidence which could properly have been submitted to a jury, and upon which, if believed by them, they could legally find a verdict for the plaintiffs, the verdict could not be set aside as matter of law. *Heywood* v. *Stiles*, 124 Mass. 275. The finding of the judge in this case stands in the same position as if it had been the verdict of a jury." The same doctrine is laid down in *Pettengill* v. *Shoenbar*, 84 Maine, 104.

In the case at bar, the creditors received security upon an existing debt with express notice from their debtor, by a letter bringing the security to their hands, that their debtor was commercially insolvent. They therefore took the security charged with the notice of the debtor's insolvency. They cannot say they did not know whether the information was true or not. If they received the security coupled with notice that it would give them a preference over other creditors and elected to hold it, they should be charged with taking it under those conditions. It was tendered as a preference under the insolvent law, and when they elected to so receive it, they received it as tendered.

The creditors received security, being charged in law with notice, actual notice, that worked knowledge of their debtor's insolvent condition. There is no evidence in the case that does or can explain away the legal aspect of the transaction. The finding, therefore, of the presiding justice, that they did not know of their debtor's insolvency, is an erroneous decision of the legal inference to be drawn from the facts of the case, and is error in law. When one inference only can be drawn from existing facts, it is a matter of law. Where the inference is doubtful, a matter of fact. *Lasky* v. *C. P. R. Co.* 83 Maine, 461.

It is claimed that the supposed preference was but an exchange of securities. The facts are, certain accounts and, perhaps, some merchandise had previously been assigned to the plaintiffs as security for their advances. They neither took possession of the merchandise, nor notified the debtors of the assignment of the accounts, but left both under the control of the insolvent, and it used or sold the merchandise and utilized the accounts by creating offsets and collecting balances, &c., whereby the plaintiffs' security was lost. But they had no security. They had a potential right to security. The assignments were not a mortgage. They could create a pledge where control of the thing assigned was secured, but until that was done the contract was executory. *Walker* v. *Staples*, 5 Allen, 34 ; *Thompson* v. *Dolliver*, 132 Mass. 103 ; *Shaw* v. *Silloway*, 145 Mass. 503 ; *Copeland* v. *Barnes*, 147 Mass. 388.

An exchange of securities of equal value works no prejudice to the creditors of an insolvent debtor and, therefore, should not be held void as a preference. *Cook* v. *Tullis*, 18 Wall. 332 ; *Clark* v. *Iselin*, 21 Wall. 360 ; *Burnhisel* v. *Forman*, 22 Wall. 170 ; *Sawyer* v. *Turpin*, 91 U. S. 114. If larger security be given in the exchange, the excess can only be attacked as a preference. *Hutchinson* v. *Murchie*, 74 Maine, 187 ; *Robinson* v. *Tuttle*, 2 Hask. 76.

But there must be an exchange. The replacing of securities already lost is not an exchange. It is the giving of new and further security, thereby diminishing the insolvent's estate to

the extent of the new security, a result exactly the reverse of an exchange.

Nor can the supposed preference be upheld upon the ground that it was given in pursuance of a prior agreement to secure, even · if such agreement had been shown. *Copeland* v. *Barnes*, 147 Mass. 388; *Re McKay*, 1 Lowell, 561.

It is claimed that the preference was purged.by agreement of the assignees made with approval of the insolvent court. Early in the insolvent proceedings plaintiffs' proved their claim for $189,313.45. As security they held sundry notes and accounts and parcels of merchandise. They agreed with the assignees to take the security at a fair valuation, and it was agreed that the fair value was $53,860.85, and that a rebate of interest amounting to $637.53, should also be allowed, in all $54,498.38, and that the proof should be correspondingly reduced and stand for dividends at $134,815.07. Upon this amount a dividend of twenty-five per cent has been paid. The agreement is in writing, and the parties differ as to its legal effect. Equity deals with the substance of a transaction regardless of form, and the substance of the transaction was that the plaintiffs should apply their security to the payment of their claim at a fair valuation, and prove the balance. They did so. The assignees parted with all title to the security, and it was applied in payment of the debt. This was all they could agree to do and all they did do. Their action might conclude them but it could not conclude others. Each creditor is given by statute the right to contest the proofs of other creditors, and some creditors have availed themselves of that right in this case, and their contentions must be heard and considered. They have shown a preference, included in the securities of the plaintiffs, to the amount of $11,355.54. Under the statute, until they surrendered this to the assignees, they are debarred from proving their debt. When they do surrender it, they are entitled to have their proof of debt increased by that amount, and would be entitled to receive upon it a dividend of twenty-five per cent to give them an equality with all the other creditors. After giving them credit for this amount, the preference to be surrendered would be $8,516.64.

The injury, therefore, suffered by the defendants on account of the erroneous ruling of the court below, can be measured and exactly determined from the evidence produced before us, as it has all been reported, and, as this cause is of long standing, we think best to finally determine it if possible. If, therefore, the plaintiffs elect to pay the assignees, within thirty days, the sum of $8,516.64 they may increase their proof of debt in the insolvent court by the amount received as a preference, viz :: $11,355.54, so that the same shall stand proved to the amount of $146,170.61, upon which they may share equally with the other creditors in future dividends, if any are paid, and the exceptions are to be overruled, otherwise sustained.

*Mandate accordingly.*

EMERY, J. I am constrained to dissent. I cannot but think the opinion works a practical usurpation by the law court of a power not intrusted to it.

Bills of exceptions were not devised, and have not been used, for reviewing questions of fact. Hence, the statute authorizing bills of exceptions to be brought into the law court, has always been understood to exclude the consideration of such questions. Where the law has provided no appeal, nor motion for a new trial, it has required a court's findings of facts to be taken as conclusive. *Pettengill* v. *Shoenbar*, 84 Maine, 104.

The proposition that the respondent creditors knew that the debtor was insolvent, or was in contemplation of insolvency, is a proposition of fact, and is alleged as such in the petition. It is to be established, not by principle or authority, but by evidence. Without evidence, the proposition is without support. *Knapp* v. *Bailey*, 79 Maine, 195.

I understand these positions, just stated, to be substantially conceded in the opinion. It is said, however, that when the inference to be drawn from existing facts is doubtful, it is a matter of fact; but when the inference to be drawn is clear, it is a matter of law. Upon this proposition seems to be based this action of the law court in overturning, by means of a bill of exceptions, a court's finding of facts, in a case where the law has not authorized an appeal nor a motion for a new trial.

But is not the inference from one fact to another,—from the fact known to the fact sought,—always an inference of fact? Does the facility or difficulty of the inference change its nature? Is it not in either case, clear or doubtful, to be drawn by the judge of the facts, and not by the judge of the law? Upon appeals and motions for new trials, the members of the law court sit as judges of the facts, and weigh evidence and draw inferences as such.

In every trial of facts by a court, each party may insist, and usually does insist, that the inference to be drawn from the evidence is clear. According to the doctrine of the opinion, a party, by such insistence, raises a question of law which may be taken to the law court upon a bill of exceptions. He may in every case require the law court to entertain his bill of exceptions, and review the evidence, so far as to determine whether the inference to be drawn is clear or doubtful. Upon an appeal or motion for a new trial, the law court does no more,—for if the inference to be drawn is found to be doubtful the findings of fact by the court or jury are accepted; and it does this much, as a trier of the fact, not as a trier of the law.

To thus make a bill of exceptions perform the office of an appeal or a motion for a new trial, is to open a new and wide door for appeals from a court's findings of facts in those cases where the law has intended no appeal. I can see no limit to the use of that door by dissatisfied litigants.