(November 22, 1911.)

STATE, Respondent, v. LEO CRAMER, Appellant.

[119 Pac. 30.]

BANK—RECEIVING DEPOSITS WHEN INSOLVENT—LIABILITY OF OFFICERS —INSTRUCTIONS—INSOLVENCY DEFINED—INSTRUCTIONS—PRINCIPAL AND ACCESSORY.

(Syllabus by the court.)

1. Where the vice-president and business manager of a bank, with full knowledge that his banking institution is insolvent and will not be able to meet its obligations and repay its depositors in the ordinary and due course of business, permits or consents to such banking institution continuing to receive deposits through its regular employees, he is criminally liable under the provisions of sec. 2985, Rev. Codes.

2. Sec. 2985, Rev. Codes, was enacted for the special purpose of protecting those who place their money on deposit in banking institutions, and the legislature clearly intended in enacting said section to make all the officers who have knowledge of the condition of the bank responsible for the acts of employees thereof in receiving deposits.

3. Certain instructions offered on behalf of the defendant and refused by the court considered, and instruction given by the court approved, to the effect that if at the time the deposit in question was received said bank was kept open with the knowledge and consent and under the general authority of the defendant as an officer of said bank for the doing of business and the reception of deposits, and said defendant knew that deposits were being received, though not personally receiving the same, then said deposit in question was received by defendant as an officer of said bank, within the meaning of the statute.

4. The word "insolvent," as used in sec. 2985, Rev. Codes, and as applied to banking institutions, means that a bank is insolvent when its assets and property are of such a character and value or in such a condition that it is unable to meet the demands made upon it in the usual and ordinary course of banking business.

5. Instructions refused and instructions given by the court with reference to the meaning of the term "insolvent" as used in sec. 2985 considered, and instructions given by the court approved.

6. Sec. 7697 specifically abrogates all distinctions heretofore existing between accessories and principals. Under the statute of this state an accessory is now prosecuted as a principal. (Citing *State v. Bland,* 9 Ida. 806, 76 Pac. 780.)

7. Sec. 2985 makes an officer of a bank liable as a principal and not as an accessory. Under the evidence in this case, the defendant was properly convicted as a principal, and even if any distinction between principals and accessories were recognized in this state, it would not apply in the case at bar under the provisions of said sec. 2985.

APPEAL from the District Court of the Fourth Judicial District for Lincoln County. Hon. Edward A. Walters, Judge.

Prosecution for the offense of receiving deposit in an insolvent bank by officer of such bank, under sec. 2985, Rev. Codes. Conviction had and defendant appeals. *Affirmed.*

N. M. Ruick, McFadden & Brodhead, Angel & Lamme, and Frank T. Disney, for Appellant.

In the case of an incorporated bank or banking institution, one officer cannot be held to be criminally liable for the act of another officer of the same institution in receiving a deposit, though the bank be insolvent and such condition be known to the accused. (*Ex parte Rickey,* 31 Nev. 82, 135 Am. St. 651, 100 Pac. 134.)

The language of the Idaho statute is plain and unmistakable. The officer who shall receive shall be deemed guilty. To construe this as including an officer, or officers, other than the one who receives a deposit is to do violence to the English language. (*United States v. Wiltberger,* 5 Wheat. (U. S.) 76, 5 L. ed. 37; Bishop, Writ. Laws, 226; Lewis' Sutherland Stat. Const. 356; Bishop, Stat. Crimes, sec. 195 et seq.; Sedgwick, Construction of Statutes and Const. Law, 279.)

"Penal statutes must be strictly construed and the courts can neither add to nor take from them." (*Stewart v. State,* 95 Miss. 627, 49 So. 615; *State v. Dunning,* 130 Iowa, 678, 107 N. W. 927; *State v. Youngbluth,* 60 Wash. 383, 111 Pac. 240.)

The lower court adopts in its instructions the narrower definition of the term as employed in bankruptcy and insolvency proceedings, while the defendant contends for the broader definition of the term,—for its usual and ordinary meaning as generally used and understood. (*Ellis v. State,* 138 Wis. 513, 131 Am. St. 1022, 119 N. W. 1110, 20 L. R. A., N. S., 444; *Hamilton v. Menominee Falls Quarry Co.,* 106 Wis. 352, 81 N. W. 876.)

We recognize that the statute has abolished the distinction between principal and accessory before the fact and that the latter may be indicted, tried and punished as principal. The law has not, however, changed to the extent that it is possible to hold one man criminally responsible for an act performed by another, except the former be shown to have aided and abetted the latter in the commission of the offense, and he must both "aid and abet." (*State v. Corcoran,* 7 Ida. 221, 61 Pac. 1034; *People v. Dole,* 122 Cal. 486, 68 Am. St. 50,

55 Pac. 581; 12 Cyc. 616; Hughes, Instructions, sec. 293; *Wood v. State,* 28 Tex. App. 14, 11 S. W. 678.)

"Instructions asked by the accused, presenting his defense, and which the evidence in any degree tends to support, should be given." (*State v. Manus,* 48 W. Va. 480, 37 S. E. 613, 14 Am. Cr. Rep. 245; *State v. Kerns,* 47 W. Va. 266, 34 S. E. 734; 15 Am. Cr. Rep. 468; *Hunter v. State,* 101 Ind. 241, 5 Am. Cr. Rep. 336; *Bryant v. Modern Woodmen of America,* 86 Neb. 372, 125 N. W. 621, 27 L. R. A., N. S., 326.)

"Aiding and abetting are affirmative in their character; consenting may be a mere negative acquiescence, not in any way made known to the principal malefactor. Such consenting, though involving moral turpitude, does not come up to the meaning of the words 'aid and abet.' " (*White v. People,* 81 Ill. 333; *State v. Douglass,* 44 Kan. 618, 26 Pac. 476; *Drury v. Terr.,* 9 Okl. 398, 60 Pac. 101; *Connaughty v. State,* 1 Wis. 159, 60 Am. Dec. 370; *Butler v. People,* 125 Ill. 641, 8 Am. St. 423, 18 N. E. 338, 1 L. R. A. 211; *State v. Teahan,* 50 Conn. 92; *State v. Empey,* 79 Iowa, 460, 44 N. W. 707; *State v. Corcoran* (Ida.), *supra.*)

J. H. Peterson, and O. M. Van Duyn, Assistants to Attorney General, for Respondent.

There can be no question, under any of the decisions, but that in case this were a private bank, and not a corporation, the statute would include in its application not only the person physically receiving the money, but also the officers of said bank who were cognizant of the condition of the bank, and were aware of the deposit. (*Baker v. State,* 54 Wis. 368, 12 N. W. 12; *State v. Cadwell,* 79 Iowa, 432, 44 N. W. 700; *State v. Buck,* 120 Mo. 479, 25 S. W. 573; *State v. Eifert,* 102 Iowa, 188, 63 Am. St. 433, 65 N. W. 309, 71 N. W. 248, 38 L. R. A. 485; *Meadowcroft v. People,* 163 Ill. 56, 54 Am. St. 447, 45 N. E. 303, 35 L. R. A. 176; *State v. Boomer,* 103 Iowa, 106, 72 N. W. 424; *State v. Quackenbush,* 98 Minn. 515, 108 N. W. 953; *State v. Shove,* 96 Wis. 1, 65 Am. St. 17, 70 N. W. 312, 37 L. R. A. 142; *Carr v. State,* 104 Ala. 4, 16 So. 150.)

The same proposition applies to an incorporated bank. (*State v. Mitchell*, 96 Miss. 259, 51 So. 4, 26 L. R. A., N. S., 1072, and cases cited; *Ellis v. State*, 138 Wis. 513, 131 Am. St. 1022, 119 N. W. 1110, 20 L. R. A., N. S., 444; *Parrish v. Commonwealth*, 136 Ky. 77, 123 S. W. 339; *Ex parte Smith* (Nev.), 111 Pac. 930.)

The cases are almost unanimous in supporting the instructions of the trial court with regard to when a bank is to be deemed insolvent. (5 Cyc. 559; Jones on Insolvency and Banking Corporations, sec. 12; 4 Words and Phrases, 3654; 3 Ency. of Law, 847; *State v. Myers*, 54 Kan. 206, 38 Pac. 296; *State v. Cadwell*, 79 Iowa, 432, 44 N. W. 700; *Walton v. First National Bank*, 13 Colo. 265, 16 Am. St. 200, 22 Pac. 440, 5 L. R. A. 765; *State v. Stevens*, 16 S. D. 309, 92 N. W. 420; *State v. Sattley*, 131 Mo. 464, 33 S. W. 41; *State v. Darrah*, 152 Mo. 522, 54 S. W. 226; *State v. Burlingame*, 146 Mo. 207, 48 S. W. 72; *State v. Beach*, 147 Ind. 74, 43 N. E. 949, 46 N. E. 145, 36 L. R. A. 179; *Meadowcroft v. People*, 163 Ill. 56, 54 Am. St. 447, 45 N. E. 303, 35 L. R. A. 176; *Commonwealth v. Rockafellow*, 163 Pa. 139, 29 Atl. 757; *People v. Bank*, 159 Cal. 65, 112 Pac. 866.)

BRYAN, District J.—On the 10th day of January, 1911, an information was filed against the defendant and others in the district court in and for Blaine county, the charging part of the information being as follows:

"That on the 31st day of August, A. D. 1910, at the City of Hailey, County of Blaine, State of Idaho, the said John J. Plumer, then being an officer, to wit, president of the Idaho State Bank, a corporation organized and then and there existing under the laws of the state of Idaho and as such corporation then and there engaged in a general banking business at the said City of Hailey, and the said Leo Cramer then being an officer, to wit, vice-president of said bank, and the said Arthur B. Cutts, then being an officer, to wit, cashier of said bank, and the said Hugh Cramer, then being an officer, to wit, director of said bank, did, as such officers of said bank, at the time and place aforesaid, and before the filing of this

information, wilfully, unlawfully, feloniously and fraudulently, and with intent on the part of each of said officers to cheat and defraud one Helen Foster, receive a deposit in said bank in the sum of forty dollars, lawful money of the United States of America, of and from the said Helen Foster, which said money was then and there the property of said Helen Foster; and which said Idaho State Bank was insolvent at the time said deposit was received as aforesaid, and each of said officers knew that said bank was insolvent at the time of receiving said deposit.''

The defendant was tried on said information, and on April 25, 1911, the jury returned a verdict of guilty as charged in said information. From this judgment the defendant has appealed to this court.

This prosecution is founded upon sec. 2985 of the Rev. Codes of Idaho, which is as follows: ''The owners or officers of any bank who shall fraudulently and with intent to cheat and defraud any person, receive any deposit knowing that such bank is insolvent, shall be deemed guilty of a felony, and punished, upon conviction, therefor, by a fine not exceeding one thousand dollars, or by imprisonment in the State Penitentiary not exceeding two years, or by both such fine and imprisonment, at the discretion of the court.''

The transcript shows that upon the trial the state introduced evidence showing the following facts: That on August 31, 1910, the Idaho State Bank was open for business and was transacting business in the usual course; that on said date and while said bank was open for business, one Helen Foster, named in the information, having an account in said bank, deposited therein the sum of $40; that said deposit was received by Arthur B. Cutts, cashier of said Idaho State Bank, and an entry made by him in the pass-book of said Helen Foster; that said bank did not open for business on September 1, 1910, and has never been opened for business since said date, but that the said bank has been in the hands and under the control of a receiver appointed by the courts; that said deposit made by said Helen Foster was entered upon the books of said bank in the usual course of business, and that the

same was not returned to her, but appeared to her credit upon the books of said bank at the time the receiver was appointed and took charge; that the above-mentioned defendant was and had been for a number of years the active manager and in control of said bank, and directed its affairs and had knowledge of the actual condition of said bank during all of the said time, and well knew that at the time deposit was received in said bank that said bank was insolvent; that on the date of the reception of said deposit the said defendant was vice-president and director of said bank; that the Idaho State Bank named in the information was insolvent on the date of the reception of the deposit of the said Helen Foster, named in the information, and well knew that the cash value of its assets upon said date was not equal to its liabilities, exclusive of capital stock, surplus fund and interest fund; that on the said date the said Idaho State Bank was insolvent and was unable on said date to pay its indebtedness or obligations in the due course of business; that on said date the defendant, Leo Cramer, was in and about the banking-room and adjoining rooms in said bank, and well knew that the said bank was open for business and the reception of deposits and was actually receiving deposits in the usual course of business.

At the conclusion of the introduction of evidence counsel for defendant submitted to the court the following instructions:

"Instruction No. 2. The jury are instructed, that unless they find from the evidence beyond a reasonable doubt that the defendant, Leo Cramer, himself, actually received the deposit set out in the information, then they must acquit the defendant.

"Instruction No. 3. The jury are instructed that if it should appear from the evidence that the deposit of money referred to in the information was actually received into the Idaho State Bank by the cashier of the bank, Arthur B. Cutts, or by any employee or officer of said bank other than the defendant, Leo Cramer, then the defendant must be acquitted."

The court indorsed the said instructions "Refused and not given," and of its own motion gave the following instruction:

"Instruction No. 18. That to authorize a conviction of the defendant it is not essential that he should have personally received the deposit in question or that he should have known that such deposit was made. If you believe from the evidence beyond a reasonable doubt that on the 31st day of August, 1910, at the city of Hailey, county of Blaine, State of Idaho, one Helen Foster deposited $40 in cash in the Idaho State Bank and that said deposit was actually delivered to Arthur B. Cutts, the cashier of said bank; and if you further believe that said bank was on said day open and kept open with the knowledge and consent and under the general authority of Leo Cramer as an officer, to wit, the vice-president of said bank, if you find he was such officer, and other officers of said bank, for the doing of business and the reception of deposits, and that said Leo Cramer as such officer knew that deposits were being received in said bank on said day then you may find that said deposit so made by said Helen Foster was received, within the meaning of the statute of Leo Cramer as such officer of said bank."

The ruling of the trial court in refusing to give instructions Nos. 2 and 3 requested by the appellant and the giving of Instruction No. 18 by the court upon his own motion, will be considered in connection with the sufficiency of the evidence. The sufficiency of the evidence and the ruling of the trial court present the same question, whether "An officer of an incorporated banking institution, with knowledge of its insolvency, can be held to have received a deposit where a deposit is actually received by another officer of said institution." If the evidence in this case is sufficient to support the verdict, then the court committed no error in refusing to give instructions Nos. 2 and 3 and in giving Instruction No. 18. The questions thus involved have been exhaustively discussed in a number of decisions rendered by the highest courts of a number of the states, and there is some conflict in the conclusions reached. It is true, however, that a number of the decisions are based upon the particular language of the stat-

ute involved, and we shall attempt in this opinion to review
the leading cases upon both sides of the question. A very
able discussion of this question is to be found in the case of
*State v. Mitchell,* 96 Miss. 259, 51 So. 4, 26 L. R. A., N. S.,
1072, the facts summarized being as follows:

"The Scranton State Bank was a banking corporation or-
ganized under the laws of the state of Mississippi, with branch,
banks at Moss Point and Ocean Springs, Jackson County,
Miss. All of the books of the bank and all of the loans were
kept and made at the office of the parent bank in Scranton,
and the only functions the branch banks performed were to
receive and pay out deposits. Edmund Mitchell, appellee,
resided and did business in Scranton, and was at the date
of the reception of the deposit, and had been for many years
prior thereto, one of the directors of the said Scranton State
Bank, and as such director was then and there one of the
managing officers of the said bank. As such director, and
necessarily one of its managing officers, appellee was in-
dicted . . . . together with the other directors and officers of
said bank, for receiving a deposit of money in the branch bank
at Ocean Springs, in said county and state, while said Scran-
ton State Bank was in an insolvent condition, and 'when then
and there the said appellee knew, or had good reason to be-
lieve, that the said Scranton Bank was insolvent.' To this
indictment the appellee entered a plea of not guilty, and on
this issue a jury was legally drawn and impaneled to try
said cause, and the state then submitted its case, showing the
above facts, together with the following facts; that is: That
at the time of the reception of the deposit charged in the in-
dictment against the appellee the appellee was not in the
branch bank, nor was he in the town of Ocean Springs, but
was at said time in Scranton, a place some fourteen miles from
the place where said deposit was received, going about his ordi-
nary every-day duties. At the conclusion of the evidence .
offered for and on behalf of the state, the defendants an-
nounced that they had no evidence to offer, but filed a motion
to exclude the evidence offered on the part of the state, and

requested the court to instruct the jury to find peremptorily the defendant not guilty of the crime charged.

"The state then requested the court to instruct the jury in substance as follows: 'That even though the jury might believe that the defendant, the appellee, was not present at the time of the reception of the deposit charged in the indictment, and even though they might believe from the evidence that he did not know of this specific deposit being made in said branch bank, yet if the jury further believed from the evidence beyond a reasonable doubt that the defendant was a director in the Scranton State Bank, and that said branch bank at Ocean Springs on the date laid in the indictment was kept open through the direction of said appellee and the other directors of the bank for the reception of deposits, and further believed from the evidence beyond a reasonable doubt that the appellee knew, or had good reason to believe, on said date, that the said bank was in an insolvent condition, then you should find the defendant guilty as charged.' "

In discussing the case the court said: "The motion to exclude the evidence offered by the state and the peremptory instruction prayed for by the appellee to find the defendant not guilty were granted by the court, and the instruction prayed for by the state was refused, to which actions of the court the state excepted." Upon the trial it was shown that the deposit was actually received by one Louis Lundy, the cashier of the said branch bank at Ocean Springs; "that this defendant at that time was some fourteen miles away, at Scranton, where the parent bank was located. It is perfectly clear from the evidence that the said branch bank was utterly insolvent on the day of the reception of this deposit, and had been for some time prior thereto; that the said branch bank was kept open for the reception of deposits under the authority of the directors and managing officers, and that the managing officers and directors of the said branch bank knew the bank was insolvent, but did not close the doors of the bank when they knew it had become insolvent, and did not give any instructions to cease the reception of deposits, although said insolvency was well known to them.

"The main defense pressed by the appellee, this being an appeal by the state to settle the legal question involved in the giving of the peremptory charge for the defendant and the refusal of the charge indicated *supra* for the state, was that, under this statute, no one of the officers or employees of a bank can be convicted unless the particular employee or officer indicted actually manually received the deposit," etc.

After a very elaborate discussion of the questions involved the appellate court held that the instruction given by the trial court was error, and that under the facts stated the defendant, who had been one of the managing officers of the bank, and who permitted those who were working under his direction to receive deposits, and who had knowledge of the insolvency of the bank, and who took no steps to close the same, nor to prevent the further taking of deposits, could be prosecuted for unlawfully receiving deposits.

In the case of *State v. Eifert*, 102 Iowa, 188, 63 Am. St. 433, 65 N. W. 309, 71 N. W. 248, 38 L. R. A. 485, the court instructed the jury as follows:

"In determining whether the defendant received the alleged deposit of C. H. Mohling, you are instructed that it is not necessary that the evidence should show, or that you should find, that the defendant in person received such deposit, nor that he was personally present when it was received from said Mohling, if received at all; it is enough if it was received by the cashier or agent of defendant under his authority. But you are further instructed that even though the defendant instructed Theodore Eifert to close the bank, and refuse to receive or accept further deposits, and that, after such instructions to so refuse deposits, the said Theodore Eifert did accept and receive from said Mohling the deposit in question, if so you find from the evidence, still, if the defendant, with knowledge thereof, accepted and retained as a deposit the amount so received from said Mohling by said Theodore Eifert, and placed among and treated it as a part of the funds or assets of the bank, having full knowledge from what source and under what circumstances and by whom it was received, he will be deemed to have knowingly accepted

such sum as a deposit. If, however, such deposit was so received without his authority, and was not accepted by him, if at all, with full knowledge of the manner and circumstances of its being deposited, if at all, then he will not be deemed to have knowingly received or accepted such deposit.''

The court said: ''Exception is taken to so much of this instruction as relates to the action of the defendant in knowingly accepting and retaining the deposit, after full knowledge from whom and under what circumstances it had been made. The argument of defendant is that when the deposit was received and accepted by defendant's son, and entered upon the books of the bank and upon the depositor's book, the whole transaction was concluded. Now, the facts appear to be that the son had for a long time been in the bank, assisting his father; that the father was in the city of Waverly when the son, who had charge of the bank, received this deposit; that it was received on the afternoon of August 15, 1893, and several hours after the son had received a telephone message from his father to close the bank and to take no more deposits; that the father returned to Tripoli the same evening, and then learned that this deposit had been received, contrary to his orders; that said money was put into the assets of the bank; and that defendant never paid or tendered it back to Mohling. Now, when did defendant 'knowingly accept and receive' this money as charged in the indictment? We think he must be said to have done so when he returned home, and first knew of the fact of its receipt. If he had given no directions to stop business and refuse further deposits, then it might be said that he should be concluded by the transaction when the money was in fact received by his son, who had authority to act for him. But, having expressly directed the son to cease business and refuse deposits, he had no reason to suspect or believe that his orders would not be obeyed. It cannot therefore be said that he knowingly received and accepted the deposit when it was handed to his son, and by him accepted, without the father's knowledge, and against his express direction. When, however, he arrived home that evening, he became acquainted with all the facts;

he then knew that this deposit had been accepted by the son after he had directed him to take no more deposits; he knew who made the deposit; he knew he was then insolvent, and that he had been before the son had received the deposit; and, knowing all the facts, he did not repudiate the transaction, but retained and accepted the money, at the same time knowing that his bank would never open again. It seems to us that when defendant, after full knowledge of all the facts, on the evening after his return, failed to repudiate the act of his son, and took no steps looking to a return of the deposit to Mohling, he then knowingly received and accepted the deposit. . . . . The gist of the offense charged in the prosecution is in knowingly receiving and accepting a deposit, knowing that he was then insolvent. Surely one whose agent, without his knowledge or authority, and in disobedience of his express instructions, receives and accepts for his principal money as a deposit, will not by such act be rendered liable criminally for knowingly receiving and accepting the money, but it cannot be doubted that, after coming into possession of all the facts, the principal may so ratify the act heretofore done as to make it binding upon himself, and the basis of a criminal liability. If the defendant had, on becoming acquainted with what had been done, promptly disavowed the act of his son, and returned the deposit to Mohling, he would not have been guilty, as it could not have been said that he knowingly received and accepted the deposit.''

In the case of *Carr v. State,* 104 Ala. 4, 16 So. 150, the court said:

''The evidence showed that defendant and his wife, as partners, carried on a banking business in Colbert county, Alabama, under the name and style of 'Tuscumbia Banking Company'; that the defendant was the managing and controlling member of said firm; and that one Harrington was the agent of said firm, and acting cashier and bookkeeper thereof, at the time the deposit involved here was made. It was also made to appear that on the day said deposit was made the defendant was away from Tuscumbia, the town where the business was being carried on, and that the deposit was re-

ceived by said Harrington for the Tuscumbia Banking Company. On these facts it was contended by the defendant, through objections to and motions to exclude testimony and requests for instructions, that he did not receive the deposit alleged in the indictment, and should be acquitted on the uncontroverted evidence; the theory of the defense in this regard being that no other than a direct, personal, manual receipt of deposits can fill the terms of the enactment. There is nothing in this position. The defendant, as a member and manager of the firm called the Tuscumbia Banking Company, carried on the business of banking at Tuscumbia; he thereby, so long as the bank was kept open, invited the public, and Robert J. Abernathy as one of the public, to make deposits with said firm; whether present or absent personally, he provided means for the acceptance of this invitation, by the employment of Harrington to take possession of deposits tendered in consequence of it for him, and the act of Harrington in so doing is his act as fully in every sense as if he had performed it by his own hands; and this wholly regardless of all considerations as to whether Harrington himself might be held in criminal responsibility for his act as agent. The receipt of the deposit was in the usual course of business, which the defendant carried on and kept open for the very purpose, among others, perhaps, of receiving on deposit the funds of other persons, and no matter what agencies he employed he is guilty under the statute if he at the time knew, or had good cause to believe that the Tuscumbia Banking Company was in a failing or insolvent condition. (1 Morse on Banks & Banking, sec. 178; 1 Whart. Cr. Law, sec. 247; 2 Ib., sec. 1503; *State v. Cadwell et al.,* 79 Iowa, 432, 44 N. W. 700.)''

In the case of *State v. Cadwell, supra,* the court said: ''At the time the deposit in question was received, one John X. Aleck was cashier of defendant's bank at Logan, and issued the certificate; and at the time neither of the defendants was present. The certificate, against the objections of the defendants, was admitted in evidence, and the ruling is made a ground of complaint here. A specific ground of com-

plaint in argument is that the defendants were indicted for receiving the deposit, and it is not competent to show on the trial that the money was received by another than the defendants personally. We think no such rule has ever been held by a court of last resort. On the contrary, a general and well-recognized rule is that, if a person does the act constituting the offense, through the agency of another, the act is his, and it is unnecessary to aver the agency in the indictment. It may be charged directly as his act, and proof that he did the act through the agency of another will sustain a conviction. (Whart. Crim. Ev., 9th ed., secs. 102, 112; Whart. Crim. Law, 9th ed., sec. 522; *State v. Neal,* 7 Fost. (27 N. H.) 131; *Commonwealth v. Nichols,* 10 Met. (Mass.) 259, 43 Am. Dec. 432; *Stoughton v. State,* 2 Ohio St. 562; *Brister v. State,* 26 Ala. 107.)''

Continuing the court said: ''It is further said, in this connection, that the defendants are not charged with permitting or conniving at the receiving of the deposit, but with receiving it themselves, and that, under the averments of the indictment, the proofs as to Aleck's receiving the money are not admissible.'' The rule above announced is conclusive of this question. The defendants are indicted as a firm of bankers, and as such they are charged with receiving the money; and it is entirely immaterial whether they received it in person, or through their cashier. In law, if they permitted him to do it for them, they did it themselves.

In the case of *State v. Sattley,* 131 Mo. 464, 33 S. W. 41, the court used the following language:

''The defendant argues that to make defendant liable for the reception of the deposit by one of the employees acting under his direction and authority such authority must have been given after he knew the bank was in failing circumstances. This cannot be true. The moment he became aware the bank was in failing circumstances the law devolved upon him the duty of revoking the authority of any employee under him and subject to his control to receive any further deposit and his failure to prevent further deposits must be construed as a continuing authority to receive them, an assenting

thereto, because by one word it was in his power to close the bank, or notify all parties that no more deposits would be received. This was the plain measure of his duty as prescribed by the law, which he was conclusively bound to know.''

In the case of *State v. Yetzer,* 97 Iowa, 423, 66 N. W. 737, the court held: ''That an officer of an insolvent bank, who, knowing of its insolvency, permits or connives at the receiving of deposits, is guilty of the offense described, whether he is a managing party or not''; and the court also held that ''It is not necessary, to constitute a violation of such statute by an officer of the bank, who does not personally receive the deposit, that the person actually receiving it knows that the bank is insolvent, when such officer knows it, and allows such person to receive it for the bank.''

Counsel for appellant with much force and earnestness insist that under the statute the defendant cannot be convicted of the offense charged unless it be shown that he in person manually received the deposit in question, and in support of this theory of law cite the case of *Ex parte Rickey,* 31 Nev. 82, 135 Am. St. 651, 100 Pac. 134. After a careful examination of this case, together with the authorities cited, we are of the opinion that the cases, from which quotations have heretofore been made, more accurately state the rule applicable to prosecutions in this state under our statute. To adopt the rule thus announced would in effect annul the provisions of the statute on which this prosecution is founded. It would open the door to the grossest of fraudulent transactions on the part of banking officers and give them every opportunity for defrauding the public by receiving deposits through dummy and temporary employees, to hold that such officers are not liable under the statute for the receipt of deposits after the bank becomes insolvent, unless they have personally and manually received the deposits and done all the acts enumerated by the statute. Where such an officer has full knowledge that his banking corporation is insolvent and is unable to continue in its regular course of business as a banking institution, and he permits or consents to the corporation con-

tinuing to receive deposits through the regular employees of the bank and at the same time knows that the bank will not be able to meet its obligations and repay its depositors in the ordinary and due course of business, he is criminally liable and deserves to be dealt with in the manner pointed out by the statute. We have no doubt but that the statute was enacted for the chief purpose of protecting those who place their money on deposit in banking institutions and that the law-makers clearly intended to make all officers of such banks responsible for the acts of the employees thereof in receiving deposits where such officers, knowing the insolvent condition of the bank, permit the bank to continue receiving deposits or acquiesce therein, and that such officers become criminally liable under the statute.

The next question presented upon the argument is: When does a banking institution become insolvent within the meaning of the statute above quoted? During the trial counsel for appellant submitted upon this question their instructions Nos. 5, 6, 7, 8 and 9, which instructions were refused, and the court upon its own motion gave instructions Nos. 19, 20 and 21. We think defendant's proffered instruction No. 6 fairly states appellant's position upon the question of insolvency, which is as follows:

"Instruction No. 6. The jury are instructed that in this case it is incumbent upon the prosecution to prove, among other material facts, to the satisfaction of the jury and beyond a reasonable doubt that at the time referred to in the information, the Idaho State Bank was insolvent. That is, that the cash value of its assets, realizable within a reasonable time in case of liquidation by the officers and owners of said bank as ordinarily prudent persons ordinarily close up their business, was not equal to its liabilities exclusive of capital stock, surplus fund and interest fund."

This instruction was refused, and in its stead the court gave the following instructions:

"Instruction No. 19. You are instructed that a bank is insolvent when its assets and property are of such character

and value that it is unable to meet its demands in the usual and ordinary course of business.

"Instruction No. 20. You are instructed that, within the meaning of the foregoing instruction, it is not essential that the bank shall have on hand sufficient cash to pay all its depositors, or any considerable number of them, on the same day, or in case of a run on the bank or some extraordinary demand, but that it is only necessary for it to have on hand cash or available assets sufficient to meet the demands that are usually made on it from day to day in the ordinary course of business.

"Instruction No. 21. You are instructed that the 'demands' of a bank, within the meaning of the foregoing instructions, are all sums owing by it to other banks, firms, corporations, or persons, whether for money borrowed, or for money deposited with it either on time certificates of deposit, or on general deposit subject to check; but the amount owing by the bank to its stockholders, as such, for its capital stock and surplus, if any, should not be considered as a debt against the bank within the meaning of the foregoing instructions."

We think that the instructions tendered by appellant and refused, and those given by the court, squarely present the question as to when a bank becomes insolvent within the meaning of the law.

Counsel for appellant contends that a bank is insolvent within the meaning of the statute when it does not possess sufficient assets to pay within a reasonable time all its liabilities through its own agencies, and that a bank is solvent when the cash value of its assets, realizable within a reasonable time by the officers and owners of said bank as ordinarily prudent persons would ordinarily close up their business, was equal to its liabilities, exclusive of capital stock, surplus fund and interest fund. That is, a bank might be insolvent in the limited sense in which the term is used in bankruptcy proceedings, and still not be insolvent within the meaning of the statute under which this case is prosecuted. That the term "insolvent" as used in the statute means insolvent in the broad general sense in which that term is understood as indi-

cating a deficiency of one's assets to meet his liabilities when such assets are disposed of by the owner thereof in the usual way. With this contention of counsel we are unable to agree.

Webster's International Dictionary defines the word "insolvent" as follows: "Not solvent; not having sufficient estate to pay one's debts; inability to pay one's debts as they fall due in ordinary course of business, etc." The Century Dictionary defines insolvent thus: "Not solvent; unable or inadequate to satisfy all claims; bankrupt, as an insolvent debtor or estate." Under this definition the Century Dictionary quotes from *Cunningham v. Norton*, 125 U. S. 77, 8 Sup. Ct. 804, 31 L. ed. 624: "When a person is unable to pay his debts he is understood to be insolvent."

The following definition of insolvent is given in Bouvier's Law Dictionary: "The condition of a person who is insolvent or unable to pay his debts," quoting 2 Kent, 389; one who is unable to pay his debts as they fall due in the usual course of trade or business, although his assets in value exceed the amount of his liabilities, or the embarrassment is only temporary; citing *Morey v. Millikin*, 86 Me. 464, 30 Atl. 102; *Langham v. Lanier*, 7 Tex. Civ. App. 4, 26 S. W. 255; *Corey v. Wadsworth*, 99 Ala. 68, 42 Am. St. 29, 11 So. 350, 23 L. R. A. 618.

In the case of *Cunningham v. Norton, supra,* the syllabus is as follows:

"When a person is unable to pay his debts he is insolvent." The only reference to the term "insolvent" in the body of the opinion is as follows: "It is objected that the deed of assignment does not, on its face, show that the assignor was insolvent, or in contemplation of insolvency. The obvious answer is that if this is a necessary requirement, the deed does state that the assignor 'is indebted to divers persons in considerable sums of money, which he is at present unable to pay in full.' When a person is unable to pay his debts, he is understood to be insolvent. It is difficult to give a more accurate definition of insolvency." (*Minton v. Stahlman*, 96 Tenn. 98, 34 S. W. 222; *Baxter v. Coughlin*, 70 Minn. 1, 72 N. W. 797.)

It may be conceded that there is some little conflict of authorities on this question, but we think the great weight of authority follows the rule given by the trial court. The rule laid down by the court applies in bankruptcy cases, and it seems to us that the same rule should apply with equal force to bankers. Bankers are trusted with the people's money, and the people are entitled to look to them for protection; theirs is a public trust. Quoting from *Baker v. State*, 54 Wis. 376, 12 N. W. 12: "A banker is one who traffics in money, receives and remits money, negotiates bills of exchange, receives money in trust to be drawn again or its equivalent, as the owner has occasion to use it. . . . . The very nature of the business prevents it from being conducted by a person isolated from all communication with others. The business, therefore, not only affects the banker or broker, but every person who deals with him as such. The business is not confined to the property of the banker or broker, but involves all property passing through his hands or intrusted to his keeping. A bank implies capital, and capital invites confidence. A man holding himself out as a banker or broker thereby gives public proclamation that he has money, and property readily convertible into money, in his possession and subject to his control, and for that reason he may be safely trusted. It requires no argument to show that such assurance is most inviting and influential with the mass of the people, especially with those unacquainted with the history and character of the man. With them the banker or broker is intrusted with money merely because he is a banker or broker, and hence supposed to have surplus capital as a standing guaranty of his agreements and his integrity."

We believe that the legislature in enacting the statute under which the defendant is prosecuted in this case intended to use the word "insolvent" in the sense that a bank receiving deposits is insolvent when it reaches that financial condition where it cannot conduct business in the usual and ordinary course of such business. For these reasons we think the court's instructions, taken as a whole, fully and fairly state the law applicable to this question.

Counsel for appellant further assign as error the ruling of the court in refusing to give defendant's instructions No. 21 to 30 relating to accessories. In said proffered instructions defendant contends that under the facts disclosed by the evidence in this case defendant could not be convicted as a principal, though charged as such in the information, and that it therefore became the duty of the court to instruct the jury upon the subject of accessories. Sec. 7697 of the Rev. Codes specifically abrogates all distinctions heretofore existing between accessories and principals, and so under the statute of this state an accessory is now prosecuted as a principal. (*State v. Bland,* 9 Ida. 806, 76 Pac. 780.) However, in the case at bar, the appellant, if guilty at all, is guilty as a principal, and he has been so prosecuted. The statute upon which this prosecution is founded clearly and undoubtedly makes an officer of a bank liable as a principal and not as an accessory, and where the facts disclosed are such as the record in this case presents, he is properly convicted as a principal, and the law of accessories, if any distinction was recognized in this state, would not apply to such case.

Counsel for defendant have brought to this court other assignments of error in the rulings of the trial court in the giving and refusing of certain other instructions. We have examined the ruling of the court on these questions, and finding no error, deem it unnecessary to review the same at length. It follows that the judgment of the trial court should be *affirmed,* and it is so ordered.

Stewart, C. J., and Ailshie, J., concur.