E. T. WHITE v. STATE.

No. A-4922.    Opinion Filed Jan. 10, 1927.
(252 Pac. 455.)

Ben F. Williams and Chas. H. Garnett, for plaintiff in error.

J. T. McIntosh, Atty. for State Banking Department, and Geo. F. Short, Atty. Gen., for the State.

BESSEY, P. J. The indictment charges E. T. White and I. E. Pacey jointly with the offense of receiving a deposit in the Bank of Commerce, an insolvent bank at Sulphur, Okla., knowing at the time that it was insolvent. A severance was ordered and plaintiff in error, E. T. White, here designated the defendant, was put upon trial, and by a verdict of a jury he was found guilty as charged. The court, in rendering judgment on the verdict, fixed his punishment at confinement in the penitentiary for a period of five years. From this judgment he appeals.

On February 23, 1922, defendant White, there present in charge of the bank, caused the bank to close its doors to the public and transferred its affairs into the custody of the bank commissioner, who, after

an exhaustive examination of the cash, books, notes, accounts, and records of the bank, found that its assets at the time of the closing were exceeded by its liabilities by more than $100,000. The particular deposit here involved was received on the 21st day of February, 1922, two days before its affairs were turned over to the bank commissioner. At this time and some years prior thereto, Charles A. Bryan was the acting vice president and cashier of the bank. Defendant White was a cashier and director and for a time had been its vice president. Among others actively engaged in its routine management was I. E. Pacey, president, director, and teller, all of whom, on occasions, acted in other capacities. Charles A. Bryan, now deceased, who committed suicide in his home at Sulphur, when he learned that defendant White had passed the affairs of the bank over to the bank commissioner, was primarily responsible for most of the irregularities connected with the bank and its management. These irregularities consisted chiefly of forged notes, false records of deposits, false book entries, corrupt manipulations of cash items, bonds, and other assets of the bank. In a number of these transactions defendant White culpably participated in these irregularities, as he claims, at the request and under the direction of the acting Vice President Bryan. The fact that defendant White participated, or was implicated in falsifying the records of the bank, and other irregular manipulations of its affairs, at the direction of the managing officer of the bank, constitutes no legal justification. There can be no agency in the commission of a crime. Under our statute it is provided that one who knowingly aids, abets, or assists another to commit an offense is guilty as a principal. It may be that the defendant White may not have known the full extent of the frauds and irregularities disclosed by the evi-

dence, but the fact that defendant White was a banker with many years experience in banking affairs, supplemented by the admissions made by him in his own testimony, indicates that he knew that this bank was insolvent covering a period of several months before it closed. It is significant that after the bank was closed and the bank examiner arrived, defendant White phoned to Bryan at his residence, requesting him to come to the bank. After a period of a half hour he phoned again and received an evasive reply from some member of the family, and at once suspected that Vice President Bryan had committed suicide or was about to do so, and that defendant White immediately rushed to the residence of Bryan, where he found his suspicions confirmed. The only fair deduction to be drawn from this incident is that defendant White knew that Bryan was afraid to face the disclosures of corrupt manipulations of funds and assets of the bank, which would necessarily follow an examination of its books, records, and affairs, and that the defendant himself had knowledge of many of these corrupt manipulations, and knew that the bank was, and for a long time had been, hopelessly insolvent.

This prosecution is based on section 4128, Compiled St. 1921, as follows:

"No bank shall accept or receive on deposit, with or without interest, any money, bank bills or notes, or United States Treasury notes, gold or silver certificates, or currency, or other notes, bills, checks or drafts, when such bank is insolvent; and any officer, director, cashier, manager, member, party or managing party of any bank who shall knowingly violate the provisions of this section, or be accessory to or permit or connive at the receiving or accepting of any such deposit, shall be guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding five thousand dollars, or by imprisonment in the penitentiary not ex-

ceeding five years, or by both such fine and imprisonment."

According to the provisions of this statute, knowledge of the insolvency of the bank is an essential element of the offense. The evidence indicates that defendant White, with others, acted as teller; that he and others had charge of the cash, made remittances, book entries, received deposits, had access to the notes and accounts, and that he was more or less familiar with the books and records of the bank and its assets and liabilities. Many of the books' entries and other records appear in the defendant's own handwriting. The state, for the purpose of showing that the defendant had knowledge of the bank's affairs and that he knew it was insolvent, introduced 48 exhibits, consisting of ledger sheets, remittance sheets, forged notes, false deposit slips, journal entries, and other records, including an exhaustive official report of the bank examiner. The particular deposit here in issue is shown by Exhibit No. 41.

"EW. Deposited with the Bank of Commerce, Sulphur, Oklahoma, by Thomas Ferries, Feb. 21.

"Please list each check separately.

|  | Dollars | Cents |
|---|---|---|
| Currency _____ | 60 | 00 |
| Silver _____ |  |  |
| Gold _____ |  |  |
| Checks as follows: |  | Pacey 13. |
| Total $————. |  |  |

"See that all checks and drafts are indorsed."

This exhibit and other testimony shows that this deposit was received by the co-defendant, Pacey, but the records also show that on this day, and days prior thereto, both Pacey and the defendant systematically worked together in receiving deposits from various de-

positors, indicating that the act of one was the act of both.

It is claimed in the first and second assignments of error that the description of the kind of money in the indictment is insufficiently stated. The statute on this feature is as follows:

"No bank shall accept or receive on deposit, with or without interest, any money, bank bills or notes, or United States Treasury notes, gold or silver certificates, or currency or other notes, bills, checks or drafts. * * *"

The indictment charges that the deposit consisted of "$60 lawful money of the United States." This averment was sufficient to apprise the accused of the nature of the accusation. It was the manifest purpose of the statute to cover money or its equivalent in commercial paper. Section 2943, Compiled St. 1921, provided that:

"Neither a departure from the form or mode prescribed in this chapter in respect to any pleadings or proceedings, nor an error or mistake therein, renders it invalid, unless it has actually prejudiced the defendant or tended to his prejudice, in respect to a substantial right."

It is contended further that the allegation that the bank was insolvent was a conclusion, and that facts should have been stated showing in what manner the actual cash market value of its assets were insufficient to pay its liabilities, or how, or in what manner it was unable to meet the demands of its creditors in the usual and customary manner. In this connection it has been held that a mere naked averment of insolvency is sufficient as a statement of fact and not a conclusion. Parrish v. Commonwealth, 136 Ky. 77, 123 S. W. 340; State v. Beach, 147 Ind. 74, 43 N. E. 949, 46 N. E. 145, 36 L. R. A. 179; Meadowcroft v. People, 163 Ill.

56, 45 N. E. 991, 35 L. R. A. 176, 54 Am. St. Rep 447; 7 C. J. 582; 3 R. C. L. 499.

The exhibit showing the particular deposit here involved shows that the deposit was "currency." It has been held that, where the indictment charges the acceptance of a deposit of "money," and the proof shows the deposit of a check, there was no variance. State v. Salmon, 216 Mo. 466, 115 S. W. 1106; Wilkin v. State, 121 Ark. 219, 180 S. W. 512; Ellis v. State, 138 Wis. 513, 119 N. W. 1110, 20 L. R. A. (N. S.) 444, 131 Am. St. Rep. 1022.

One of the essential elements of this offense was guilty knowledge—knowledge that the bank was insolvent at the time the deposit was made. To show that the accused knew it was insolvent, the state had a right to inquire into all transactions by the accused and his associates, acting in concert with him, which in any manner impaired the assets of the bank or contributed to its insolvency. The fact that some of these transactions and manipulations disclosed that other crimes had been committed makes no difference. State v. Welty, 65 Wash. 244, 118 P. 9; Appelget v. State, 33 Okla. Cr. 125, 243 P. 251; Underhill on Criminal Evidence, par. 90; State v. Hatch, 63 Wash. 617, 116 P. 286; 8 R. C. L. p. 199 §§ 195, 196, 197, and 200, "Criminal Law."

Objections were made to the introduction in evidence of the official report of John Knox, bank examiner. This was a detailed report purporting to show facts, figures, and tabulations, including comments and conclusions of the financial condition of the bank, gleaned from an examination of the books, records, and correspondence, supplemented by interviews with interested persons, and affidavits explaining particular transactions. At the conclusion of some of the separate tabu-

lations, the bank examiner stated his conclusions and deductions based upon the transaction shown. The defendant earnestly contends that, if the facts, figures, and record history of the transaction was admissible, the bank examiner's conclusions and surmises of corrupt practices was incompetent, invading the functions of the jury, and that all such portions of the bank examiner's report should have been excluded. Whether this claim is meritorious or not, the record shows that the major part of this audit of facts, figures, and tabulations appears in evidence in other forms. The evidence, independent of this report, indicates that the liabilities of the bank then, and for a long time prior thereto, exceeded its assets, and that the bank was unable to meet its obligations in the ordinary course of business, so that the features of the report to which objections were made are of minor importance. Nonexpert jurors of average intelligence, or even extraordinary intelligence, in the consideration of great masses of figures and tabulations involving the intricacies of bank bookkeeping, cannot be expected to arrive at correct rational conclusions without the aid of expert accountants. In the case of State v. Hightower, 187 N. C. 300, 121 S. E. 616, the court said:

"In a prosecution of a bank president for the receipt of deposits after knowledge of insolvency of the bank, expert testimony by the state bank examiner and an accountant to the effect that in their opinion the bank was insolvent on the day alleged in the indictment held not inadmissible as an opinion upon one of the essential facts necessary to the offense, nor was it necessary that as a prerequisite to the expression of such opinions the witnesses be required to state the facts upon which they based their conclusions, though such course would have been the better practice."

In this case the surmises and deductions were for the most part based upon the exhibits, figures, and tabu-

lations preceding the deductions. If the deductions made were not warranted by the explanatory facts shown, the defendant could have so shown by cross-examination of the bank examiner or by independent evidence. Speculative surmises and strained deductions should, of course, be excluded. In the case of Hays v. State, 22 Okla. Cr. 199, 210 P. 729, this court held:

"Under the provisions of section 5115, Rev. Laws 1910, the official reports and records of the state examiner and inspector, in so far as they pertain to the issues involved, may be introduced as primary evidence, subject to explanation or impeachment. Mere conclusions of such officer, not based on his official record, are inadmissible."

To the same effect, see State v. Salmon, 216 Mo. 466, 115 S. W. 1106; Appelget et al. v. State, 33 Okla. Cr. 125, 243 P. 251. Contra, based on statutory provisions, State v. Yegen, 74 Mont. 126, 238 P. 603.

The defendant claims that, since the deposit in question was received by I. E. Pacey, the defendant would not be criminally liable. In Appelget v. State, supra, it was held:

"Where the managing officers of a bank, with knowledge that it is insolvent, permit the bank to continue to receive deposits by its employees, they are guilty of accepting and receiving deposits within the meaning of the law, although they do not personally receive the deposits."

This rule is based in part upon the language of the statute, which includes:

"Any officer, director, cashier, manager, member, party or managing party of any bank."

This defendant was often in supreme authority at the bank in the absence of others. He was at the

time acting as director and cashier, and finally on his own initiative he turned its affairs over to the bank commissioner. He was a person exercising general authority there, by and with the consent of the others, and should therefore be held accountable criminally for any abuse of that authority. Ex parte Smith, 33 Nev. 466, 111 P. 930; 3 R. C. L. Subject, "Banks" par. 124; State v. Cramer, 20 Idaho, 639, 119 P. 30.

Complaint is made that the court erred in a number of his instructions to the jury, and in his failure to give certain requested instructions. Most of the points of law involved in these exceptions have been treated elsewhere in this opinion, requiring no further analysis. Instruction No. 7 is as follows:

"You are further instructed that a bank shall be deemed to be insolvent, first, when the actual cash market value of its assets is insufficient to pay its liabilities; second, when it is unable to meet the demands of its creditors in the usual and customary manner; third, when it fails to make good its reserve as required by law. It is not necessary that the bank shall have on hands sufficient cash to pay all of its depositors, or any considerable number of them on the same day, or in case of a run on the bank or some extraordinary demand beyond the usual and customary manner. It is only necessary for it to have on hand cash, or available assets sufficient to meet the demands that are usually made on it from day to day in the ordinary course of business. In determining the value of the assets, you should take into consideration the actual cash market value of the assets on the 21st day of February, 1922. If, therefore, you find from the evidence beyond a reasonable doubt that the actual cash market value of its assets was not sufficient to pay its liabilities on the 21st day of February, 1922, or if you find from the evidence beyond a reasonable doubt that the Bank of Commerce was not able to meet the demands of its creditors in the usual and customary manner, or if you find from the evidence beyond a rea-

sonable doubt that the Bank of Commerce failed to make good its reserve as required by law, then in either event, if you so find, you are instructed that the Bank of Commerce was an insolvent banking corporation, and you should so find. If, on the other hand, you fail to find the Bank of Commerce was an insolvent banking corporation as defined in these instructions, or if you have a reasonable doubt of the insolvency of the Bank of Commerce on February 21, 1922, you should give the defendant benefit of such doubt and acquit him."

With the exception to the part relating to the bank reserve required by law, this instruction sufficiently defines insolvency in accordance with the rules laid down in the Appelget Case, supra, where the subject was carefully considered, and we know of no reason for departing from the rule there announced. As was held in the Appelget Case, the portion of the instructions relating to the cash reserve as required by law has no application in a criminal prosecution, and the incorporation of this feature in this instruction was error; but, since no effort was made in the introduction of testimony to predicate insolvency upon a failure to maintain the cash reserve, the error is harmless. The court discreetly advised the jury that it was not essential to establish insolvency to show that the bank should have on hand sufficient cash to pay all of its depositors, or any considerable number of them, on the same day, or in case of a run on the bank or some extraordinary demand, and that it was only necessary for it to have on hand cash or valuable assets sufficient to meet the demands that are usually made on it from day to day in the ordinary course of business.

Without attempting to analyze the instructions in detail, it is sufficient to say that the instructions as a whole, with the exception of those portions relating to its cash reserve, substantially stated the law as applied to the evidence, and the allusions to the cash reserve

are immaterial, because the insolvency of the bank was otherwise established. The evidence discloses that the bank was insolvent under any definition of insolvency applicable in criminal cases. That the bank might be insolvent because of its failure to maintain its legal cash reserve was an issue not properly involved in a criminal prosecution, and since there was no evidence supporting such issue, the allusions to the legal cash reserve in the instructions was meaningless. The evidence and the instructions relating to the condition of the bank and the managing of its affairs by its officers and agents, covering a period of months, when the defendant was actively engaged in conducting its affairs, was justified for the purpose of showing that he was conversant with the financial condition of the bank, and knew, or should have known, that at the time the deposit was received the bank was insolvent.

The court does not hold that there were no errors committed at the trial. In cases like this, where a large number of witnesses are examined and a large number of exhibits are introduced in evidence involving intricate banking affairs, it would be remarkable if some errors did not appear. But, as has often been held by this court, a cause will not be reversed for errors of minor importance, which do not substantially affect the rights of the defendant. If the rule were otherwise, complicated cases of this character would be shuffled back and forth between the trial and the appellate courts indefinitely.

The judgment of the trial court is affirmed.

DOYLE and EDWARDS, JJ., concur.